## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

MATTHEW STEVENSON,
     Plaintiff,

vs.                             Civil Action No.:  5:11-cv-496-oc-37TBS

SECOND CHANCE JAI ALAI, LLC,
     Defendant.

_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT'S RENEWED MOTION FOR DIRECTED VERDICT AND MOTION FOR NEW TRIAL

Plaintiff responds to Defendant's Renewed Motion for Directed Verdict and Motion for New Trial ("Motion") (Doc. 70) as follows:

## I.    DEFENDANT IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW OR A DIRECTED VERDICT.

When compared to similar cases in the both 11th Circuit and other Federal Courts, Plaintiff's conduct far exceeds that which courts have held to be protected activity. Moreover, courts are clear that "It is axiomatic, under the FLSA, that employers must pay employees for all 'hours worked"; something Defendant was refusing to do for Plaintiff. Also, Plaintiff also produced overwhelming evidence of causation.

### A.    Plaintiff Engaged in Statutorily Protected Activity.

On at least three occasions, Plaintiff objected to two of his supervisors that Defendant's pay practices were illegal; specifically, its refusal to pay him for all hours worked.  Plaintiff even threatened a lawsuit.  On the day he was fired, and <u>before</u> his termination, Plaintiff again confronted his supervisors about the hours he worked but received no compensation.  Within a month of those objections and on the same day as Plaintiff asked to be paid for all the hours he worked, Plaintiff was fired by one of those supervisors to whom he complained.

### 1.    Statutorily protected activity under the FLSA's anti-retaliation provision is broad.

1

Case law interpreting the FLSA's anti-retaliation provisions demonstrates that courts interpret those provisions in a manner consistent with providing protection to employees. According to the 11th Circuit, "By giving a broad construction to the anti-retaliation provision ... its purpose will be further promoted." EEOC v. White & Son Enterprises, 881 F.2d 1006, 1011 (11th Cir.1989).  The 11th Circuit has taken a liberal approach to what constitutes protected activity under the FLSA — even specifically stating that it includes complaints not even listed in the FLSA's anti-retaliation provision.  In White and Son Enterprises, 881 F.2d at 1011, the Court noted as follows:

> The charging parties did not perform an act that is explicitly listed in the FLSA's anti-retaliation provision; however, we conclude that the unofficial complaints expressed by the women to their employer about unequal pay constitute an assertion of rights protected under the statute. **The FLSA in general is remedial in purpose.**

(e.s.).  Therefore, the 11th Circuit concluded that female employees who asked for equal pay had "filed any complaint" under the FLSA and those comments were protected activity. Id. Other courts have also classified as "complaints" statements far less definite than those in this case.  See e.g. Romeo Community Schools, 976 F.2d at 989 (plaintiff who told school district that she believed they were "breaking some sort of law" by paying her lower wages than previously paid to male employees had "filed any complaint" under the FLSA).

## 2.  Plaintiff's objections were clear and detailed, and Defendant knew exactly what the issue was.

Defendant misrepresents the record when it indicates at page 7 of it Motion that Plaintiff only "testified that he was threatened the he wouldn't be paid for his hours, and responded that Second Chance could not do that, it was illegal."  In reality, Plaintiff's objections came during multiple separate and detailed conversations he had with two of his supervisors.  During these conversations, they discussed the issue in detail including the

2

Plaintiff's use of (and inability to use) the time-clock, Plaintiff's employee number (and the lack thereof), that Plaintiff had no working time card, that Plaintiff was using the sign in/sign out sheet supplied by the Defendant, and Defendant's requirement that he use the time-clock to be paid.  For example, Plaintiff's testimony at Doc. 65, Page 31 is as follows (e.s.):

> When I started working there, they never gave me one. I only asked for an employee number after I was being threatened that I wasn't going to get paid for my hours. Around January -- end of January, I was approached by Ricky at a table, and he told me that **I would have to start using the time-clock. If I didn't start using the time-clock, I wasn't going to get paid for my hours**. And I told him -- I said, They can't do that. That's illegal. And his reply was, Don't blame me; I'm just delivering the message, is what he said. And I was, like, **Well, I can't use the time-clock. I don't -- my badge broke and I don't -- you know, I have no way to use it.** That's when he informed me to use my employee number, and I told him I didn't have an employee number. And he acted kind of confused, like, **You don't have an employee number? And I'm, like, No, they've never given me one.** And then he's, like, Well, how do you use the time-clock? And, like, I use my swipe badge. So after explaining that to him, he said -- **he informed me that he would get my employee number for me.**

Multiple other conversations between Plaintiff and his supervisors occurred regarding the time-clock issue.  Plaintiff's testimony was even specific about when these discussions occurred.  For example, Plaintiff's testimony at trial discussed a discussion with his supervisor in January 2011 (Doc. 66, Page 16), another one in "early February 2011" (Doc. 66, Page 16), another one "toward the end of February, around the 22nd or 24th" (Doc. 66, Page 18), and again on "February 28, 2011." (Doc. 66, Page 12 and Doc. 66, Page 10). These discussions between Plaintiff and his supervisors occurred repeatedly over a two month period.

Due to Defendant's actual failure to pay Plaintiff, Plaintiff was forced to object to the Defendant's pay practice of refusing to pay him for all hours worked.  In these conversations, the Plaintiff objected to Defendant's insistence that he impossibly use the time-clock (instead of the sign in/sign out sheet supplied by the Defendant) in order to be paid.  Some of the testimony regarding these conversations are as follows:

- "He told me that I — if I didn't use a time card, I wasn't going to get paid. I said that was illegal. I explained to him -- I was, like, **You were supposed to get me my employee number. I still don't have it."** Plaintiff's testimony - Doc. 65, page 31-32.

- "Roger come up to me, threatened the same thing, said that **I needed to use my employee number in the time-clock or I wasn't going to get paid.**" Plaintiff's testimony - Doc. 65, page 31-32.

- "You testified that the first time that Ricky came to you and said that you wouldn't be paid if you didn't use the time-clock -- you testified that you said, You can't do that; that's illegal." Plaintiff's testimony — Doc. 66, page 14.

- "Q. Okay. You also testified yesterday that toward the end of February, around the 22nd or 24th, **Ricky and Roger came to you, and this time it was Roger who said that you needed to use your employee number or the time-clock or you would not be paid?** A. That's correct." Plaintiff's testimony, Doc. 66 — page 18.

- "He said if -- he said, This is your final warning. If you don't use the time-clock, you're not getting paid, period." Plaintiff's testimony, Doc. 66 — page 18.

- "Q. So basically he said, We're going to flat out not pay you if you don't use the time-clock? A. That's correct. Plaintiff's testimony, Doc. 66 — page 18.

The basis of Plaintiff's objections could not be more clear. Defendant was refusing to pay Plaintiff anything for the time he worked if he did not clock in with the employee time-clock. However, Defendant would not supply Plaintiff with the employee time card or employee number he needed to use the time clock. These conversations included both his immediate supervisor and the Poker Room Manager (whom actually terminated Plaintiff) — sometimes with them both present. See Plaintiff's testimony, Doc. 66 — page 18. Plaintiff repeatedly informed Defendant that his time card broke and he had no employee number — and thus using the time-clock was impossible; so he had to record his time worked with the paper sign in/sign out sheets supplied by the Defendant. See Doc. 65, Page 29-30. Plaintiff even had additional conversations with his supervisors about the issue, such as this one:

Q. ....Did you talk to your supervisors about the problem?

A. Yes, I did. I informed them that I could not get ahold of Denise and asked them if they could send her an email or leave a message to get a time card.

Q. Did they say it would be taken care of?

A. Yes. They said they would take care of it for me.

Plaintiff's testimony — Doc. 66, page 327.   Defendant promised Plaintiff it would supply him with an employee number but failed to do so.  Id. at page 31 ("after explaining that to him, he said -- he informed me that he would get my employee number for me.").  In the meantime, Plaintiff's supervisor informed him it was acceptable to use paper sign in/sign out sheets Defendant stocked next to the time-clock. See Doc. 65, Page 29-30 ("I was not given a new swipe card. I -- I remember talking to Ricky about it, and I remember him saying, Well, how are you clocking in and out? I said, Well, right now **I'm writing my time down on a sheet, and he said okay**."), (e.s.).

Thus, Defendant was creating a clearly illegal situation for Plaintiff because it required him to do something impossible (use a time-clock Plaintiff could not use without being supplied with a working time card or employee number) in order to get paid for all the hours he worked.  Plaintiff repeatedly attempted to obtain a working time card and/or employee number, and was told by both his supervisors that it would be taken care of.  However, instead of fixing the problem by providing Plaintiff with either a time card or his employee number, Defendant simply chose not to pay him for all hours worked — even though Defendant told Plaintiff it was acceptable for him to use the paper sign in/sign out sheets it supplied.

At trial, testimony revealed that Defendant's insistence that Plaintiff obtain another time card was patently unreasonable as Defendant stopped stocking them.  Vickie Jane Pernek testified that the Defendant stopped ordering time cards, something Plaintiff was never informed about.  Her testimony, on Doc. 66, page 101, is as follows:

Q. Did you personally ever talk to Matt Stevenson about using the time-clock to punch in and out?

A. We had discussed it at one point, and I told him that he needed to use it if he was going to be paid properly.

Q. Okay.

A. He wanted a swipe card. We didn't do them anymore. They weren't ordering them.

Plaintiff's supervisors told him its was "okay" to write down his time on the sheet next to the time clock, and promised to provide him with his employee number so Plaintiff could use the time-clock. See Doc. 65, Page 29-30, See also Plaintiff's testimony at Doc. 65, Page 30 ("Q. So was that how you would clock in and out, writing it down? A. That's how I clocked in and out from that point on."). Therefore, to log is hours, Plaintiff used the only available means to him, which was to write his hours down on paper supplied by the Defendant next to the time-clock.

On his last day at work, Plaintiff approached his supervisor and said he needed to discuss with them payment of his missing hours. Plaintiff's testimony regarding the day he was terminated, at Doc. 65, Page 36, was as follows:

I came to work with the letter in hand to explain my missing hours. I walked into the poker room. Ricky was the supervisor at the time. He was at the podium. **I told him that I needed to see Roger about some missing hours. He told me to go wait for him in his office.**

(e.s.). Notably, Plaintiff told his supervisor that he needed to see the Poker Room Manager (Roger Coscarat) before Plaintiff was fired and before Plaintiff actually met with Mr. Coscarat to be terminated. Moments after Plaintiff asked to talk with Roger Coscarat about being paid for his missing hours, Plaintiff was terminated. Id. at 36-37. It is impossible that Defendant would not have had enough information to be on notice regarding the nature of Plaintiff's objections – in fact, the meeting wherein Plaintiff

was terminated was held specifically because Plaintiff was asking for it (except, of course, Plaintiff was asking for the meeting so he could obtain payment — not to be fired).

Defendant relies on Hagan v. Echostar, LLC, 529 F.3d 617 (5th Cir. 2008) in its Motion. However, that case actually supports the Plaintiff.  At pages 626-627 of Hagan, the court noted as follows (italics in the original):

> However, he did not frame *any* of his objections in terms of the potential illegality of the change. Hagan admits that he did not think the change was illegal, and it is undisputed that the change was in fact legal.  Thus, Hagan's personal objections to the schedule change do not constitute protected activity under the FLSA.

In the instant case, opposite to the facts in Hagan, the Plaintiff on multiple occasions complained that the Defendant's conduct was illegal and — furthermore — that he would start a lawsuit over the issue. See also Johnson v. Advertiser Co., 778 F. Supp. 2d 1270 (Dist. Court, M.D. Alabama 2011) ("Even though Johnson may not have mentioned the FLSA by name in any of his internal complaints, this does not disqualify his statements from being considered protected activity. . . .  the complaints, as described in Johnson's briefs, demonstrate Johnson's concern over a company policy that, according to Johnson, actively encouraged underreporting of hours worked. . . . Therefore, the Court finds that Johnson engaged in protected activity.").  Therefore, Plaintiff's objections were clearly protected activity.

### 3.    Plaintiff's objections were both that the conduct was illegal and that he would file a lawsuit.

Plaintiff objected at least three times, to two different supervisors (one of whom signed his termination form), that the Defendant's stated pay practice of not paying him for all hours worked was "illegal."  During the third conversation, Plaintiff threatened a lawsuit to recoup said pay.  Some of the testimony at trial is as follows (e.s.):

a)  **Plaintiff's testimony — Doc. 65, page 31 (lines 7-13):**

Around January -- end of January, I was approached by Ricky at a table, and he told me that I would have to start using the time-clock. **If I didn't start using the time-clock, I wasn't going to get paid for my hours. And I told him -- I said, They can't do that. That's illegal.** And his reply was, Don't blame me; I'm just delivering the message, is what he said.

b)  **Plaintiff's testimony - Doc. 65, page 31-32:**

Q. Did you ever inform your managers that you believed their pay practices were illegal?

A. Yes.

Q. And who -- who did you tell that to?

A. I told Ricky twice, and I told Roger Coscarat, the poker room manager, so...

Q. **And did you threaten -- did you threaten a lawsuit?**

**A. Yes, I did.** I was approached by Ricky two times. After the first time, I was approached a couple of weeks later. We basically had the same conversation. He told me that I -- if I didn't use a time card, I wasn't going to get paid. I said that was illegal. I explained to him -- I was, like, You were supposed to get me my employee number. I still don't have it.
.....
About a week or so went by, and then I was approached by Roger. Roger come up to me, threatened the same thing, said that I needed to use my employee number in the time-clock or I wasn't going to get paid. **I said -- I said that was illegal, and if you did that, I would seek legal action**. And we kind of -- obviously were kind of upset at each other.

c)  **Plaintiff's testimony — Doc. 66, page 14:**

Q. You testified that the first time that Ricky came to you and said that you wouldn't be   paid if you didn't use the time-clock -- you testified that you said, You can't do that;   that's illegal?

A. He came -- yeah. He came to me, said, If you're not going to use -- they told me to  tell you **that if you're not going to use the time-clock, you're not going to get paid, and my first reply was, like, They can't do that; that's illegal.**

d)  **Plaintiff's testimony — Doc. 66, page 18:**

Q. All right. And, again, you testified that you told Roger that it was illegal and that you would seek legal action?

A. Yes. At the end of the conversation, I told Roger — I said -- when he said that this -- you know, that I wasn't going to get paid, I said, If they do that, **I'll seek legal action.**

e)   **Plaintiff's testimony - Doc. 66, page 19:**

Q. Okay. **So basically he said, We're going to flat out not pay you if you don't use the time-clock?**

A. **That's correct.**

Plaintiff objected to two of his supervisors that their actions were both illegal and threatened a lawsuit if not corrected.  As discussed below, this is protected activity.

Moreover, Plaintiff's comments to his supervisors on the very same day he was fired is (standing by itself) protected conduct.   As noted in his testimony at Doc. 65, Page 36, Plaintiff informed his immediate supervisor (Ricky) that "needed to see Roger [Croscrat] about some missing hours."  He was then summoned to Roger Croscrat's office where he was summarily terminated by Roger Croscrat — without warning — for no stated reason.  Plaintiff's comment that he was missing hours and needed to discuss payment of those hours with his supervisors is clearly protected conduct.  When considered in the light of Plaintiff's prior, and multiple, conversations with these same supervisors (including Plaintiff's thread of litigation), the fact that Plaintiff engaged in protected conduct becomes crystal clear.

4.   **Plaintiff's objections were protected activity, even if he never mentioned the "FLSA" by name.**

Protected activity does not require specific reference to the FLSA.  Burnette v. Northside Hosp., 342 F. Supp. 2d 1128, 1133-34 (N.D. Ga. 2004). Informal complaints to an employer regarding wage practices or any conduct that implicates the FLSA qualify is protected activity. EEOC v. White and Son Enters., 881 F.2d 1006, 1011 (11th Cir.1989).

9

In its Motion, Defendant mysteriously cites <u>Kaplan v. Burrows</u>, 2011 US Dist. LEXIS 125653  (Case No. 06-10-cv-95-Orl-35DAB) (M.D. 2011) as support.  Defendant describes the case as one where plaintiff was sanctioned for seeking payment under the FLSA because "plaintiff knew or should have known that he was exempt from the FLSA, because he worked as a manager."  <u>See</u> Defendant's Motion at page 9.

Contrary to the facts in <u>Kaplan</u>, there is no dispute that Plaintiff was entitled to minimum wage for all hours worked pursuant to the FLSA.  Plaintiff was not a manager, and was not exempt from its provisions — nor did Defendant ever make such a claim or argument. In this case, there's absolutely no dispute that Plaintiff was entitled to the payment of minimum wage by the Defendant pursuant to the FLSA.

Not paying Plaintiff for all hours worked is clearly a violation of the FLSA.  <u>Alvarez v. IBP, Inc.</u>,339 F.3d 894, 905 (9th Cir. 2003)  ("**It is axiomatic, under the FLSA, that employers must pay employees for all 'hours worked.'**"), <u>citing</u> 29 U.S.C. §§ 206, 207 (1999); <u>Turner v. City of Philadelphia</u>, 262 F.3d 222, 224 (3d Cir.2001).   Defendant's policy of not paying Plaintiff for all hours worked thus clearly violated the FLSA because it is "axiomatic" that not paying employees at least the minimum wage for all hours worked violates the FLSA.  Defendant's citation to <u>Kaplan</u> is completely misplaced.

Similarly, Defendant's citation to <u>Burnette v. Northside Hosp.</u>, 342 F.Supp.2d 1128, 1134 (N.D. Ga. 2004) is equally mysterious. That case involved a plaintiff claiming reimbursement for on call time (time when the plaintiff was not actually working).  <u>Id.</u> at 1135 The instant case has nothing to do with on-call time.  Here, Plaintiff is unquestionably entitled to minimum wage for all hours he worked. There is no dispute that he actually worked the time he claimed.

When this evidence is viewed with all reasonably interfaces drawn in favor of the

Plaintiff, his objections  are far more specific and meaningful than the informal and complaint made to the owner's wife in Wigley v. Western Florida Lighting Inc., 2005 WL 3312319, at *4 (M.D. Fla. Dec. 7, 2005).  In Wigley, one of the issues was whether Plaintiff's "complaint to Donati's wife regarding Defendants' failure to pay her for partial days she worked" was protected activity.  Id. at *5.  The Florida Middle District court found that "Plaintiff's informal complaint to Donati's wife regarding Defendants' failure to pay her for partial days she worked constitutes protected activity within the meaning of the FLSA".

Plaintiff's objections were also clearly protected in consideration of the situation described in Hagan v. Echostar, 529 F.3d 617 (5th Cir. 2008) (a case relied upon by the Defendant).  In Hagan, the court found that Hagan did not engage in protected activity because "he did not frame *any* of his objections in terms of the potential illegality of the change." (emphasis in original).  Here, not only did Plaintiff complain to his supervisors that the practice was illegal on three occasions, but he also threatened a lawsuit.

As noted in the case law cited supra, Plaintiff did not need to specifically reference the "FLSA" in his objections for the conduct to be protected. See e.g.  EEOC v. White and Son Enters., 881 F.2d 1006, 1011 (11th Cir.1989).  Moreover, Plaintiff also personally believed that Defendant was violating the law. See Plaintiff's testimony at Doc. 65, page 33,  (lines 13-15) (Q. Did you believe that Ocala Poker was violating the Fair Labor Standards Act? A. Yes.).

### 5.     Defendant waived arguments it did not make when making its directed verdict at trial.

At trial and during its Motion for Directed Verdict, Defendant failed to specifically raise the argument that the underlying complaint Plaintiff was making was not something covered by the FLSA and/or that Plaintiff did not have a good faith belief he believed he was covered by the FLSA's minimum wage provisions.  See Doc. 66, page 93-95, attached hereto as

**Exhibit A**.  Therefore, the argument is waived.  See .e.g. Purcell v. Seguin State Bank & Trust Co., 999 F.2d 950, 956-57 (5th Cir.1993) (issue raised in a JNOV motion that was not specifically raised in motion for a directed verdict at close of evidence held waived); Piesco v. Koch, 12 F.3d 332, 340-41 (2d Cir.1993) (motion for a DV failed to specify any grounds and thus was not sufficiently informative to preserve defendant's right to move for a JNOV).

Defendant may claim that it generally argued that Plaintiff did not meet the elements to his claim, however courts have demanded specificity in motions for directed verdict.  This was noted in Palm Bay International, Inc. v. Barolo, Case No. CV 09-599, (ED New York 2011), which stated as follows: "more recently courts have more rigorously exacted compliance with the specificity requirement." The court in Palm Bay cited several cases for the proposition that issues not specifically raised in a motion for directed verdict are waived: Smith v. Lightening Bolt Production, Inc., 861 F.2d 363, 367 (2d Cir. 1988) ("In all, we see no indication that the defendants' motions were sufficiently specific to alert Smith to these present contentions . . ."); McCarthy v. Pleasant Run Inc., 826 F.2d 1554, 1555-56 (7th Cir. 1987) ("Thus, neither motion for directed verdict presented the question whether the issue of the defendant's negligence should be withdrawn from the jury and resolved in the plaintiff's favor. She could not present that issue for the first time in her motion for judgment n.o.v.").

In this case, Defendant's motion for directed verdict lacked the specificity it now asserts in its post-trial motion.  Simply stating that the Plaintiff did not establish an element of his claim without specifics as to why the element was supposedly not satisfied fails to put Plaintiff not proper notice of an issue that could have been cured.  The practice obliterates the intent behind the long held rule that these issues be raised at trial if a defendant intends to later request a judgment notwithstanding the verdict.  Similarly, the issue was not properly preserved in the Pretrial Statement. Thus those issues were waived.

**B.      Plaintiff Sufficiently Proved His Termination was due to his Statutorily Protected Activity.**

Plaintiff proved at trial his termination was due to his objections.  He did so via a showing that the timing between his termination and his objections was close, that Defendant did not follow its standard procedures for terminating its employees, and that Defendant concealed the reason it terminated Plaintiff.

**1.      The timing between Plaintiff's objections and termination proves the causal connection.**

A causal connection is likely to be found where there is a "close temporal proximity" between the time an employer learns about protected activity and the adverse employment action.  Farley v. Nationwide Mut. Ins., 197 F.3d 1322, 1337 (11th Cir.1999). Here, the Plaintiff's objections and his termination all occurred within the same month.  Plaintiff's testimony – Doc. 65, page 33, provides as follows:

> Q. And this conversation, how many -- how many different conversations did you have where you stated the practice was illegal?
>
> **A.  Three that I can remember.**
>
> Q.  And the first one, how long before your termination did that occur?
>
> **A.  It was within the month.**

Notably, Plaintiff was fired by Roger Croscrat the same day Plaintiff approached his supervisor stating that he "needed to see Roger [Croscrat] about some missing hours."  Doc. 65, Page 36.  Not only was it the same day, it was literally minutes later.  Id.

Therefore, there is clearly evidence of causation.  See Donnellon v. Fruehauf, 794 F.2d 598, at 600-01 (11th Cir. 1986) (fact that plaintiff was discharged only one month after filing complaint with the EEOC "belies any assertion by the defendant that the plaintiff failed to prove causation"); Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007)("The

burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action.").

### 2. Defendant never argued at directed verdict that Brian Matthews was the sole decision-maker.

Defendant did not argue in its motion for directed verdict that Brian Matthews was the sole decision-maker without knowledge of Plaintiff's objections.   Doc. 66, page 93-95. See Exhibit A, attached hereto.  Therefore, Defendant has waived the right to argue that in its motion because Plaintiff lacked notice the argument would later me made and any alleged defects could have been resolved at trial.  See, those cases cited supra in section I.A.5. Similarly, the issue was not preserved by Defendant in the Pretrial Statement.

### 3. Roger Croscrat — Poker Room Manager - testified that he terminated Plaintiff, and even signed his termination form.

Even if the argument was not waived, in the case of a corporate employer, "the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression and acted within the scope of his or her agency when taking the action." Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1197 (11th Cir.1997).[1]  As discussed below, clearly Roger Coscarat  was the "corporate agent" who terminated Plaintiff — and this was undisputed at trial.  Moreover, it is also undisputed that he acted within the scope of his employment as Poker Room Manager and Plaintiff's supervisor. See Roger Croscrat's testimony at Doc. 66, Page 50 ("A. I was the room manager, yes.")

Roger Coscarat was both aware of Plaintiff's objections and was the person who actually terminated Plaintiff.  The testimony at trial was very clear that Roger Croscrat terminated Plaintiff during  meeting between him and Plaintiff (the one that occurred immediately after Plaintiff asked supervisor Ricky he needed to meet with Roger Croscrat

---

1  Defendant's quote from Raney at page 11 of its Motion for New Trial leaves out this last part of Raney (the part that says "and acted within the scope of his or her agency when taking the action").

about payment for his missing hours).  Mr. Coscarat was indisputably the "corporate agent

who took the adverse action." The testimony was as follows:

a.   **Plaintiff's Testimony — Doc. 66, page 10 :**

Q. One. Okay. **You testified yesterday that you were fired on February 28, 2011, by Roger Coscarat?**

**A. That's correct.**

Q. He was the poker room manager?

A. Yes.

b.   **Plaintiff's testimony, Doc. 66, page 12:**

A. I passed Roger. As I was walking to Roger's office, like I said, he came out, and we passed in the poker room. And I told Roger -- I said, Roger, I need to talk to you about my hours, and he goes, Wait for me in my poker room -- or wait for me in my office.

Q. Okay. Then you testified that when you -- **when Roger came into the office, he said that they were going to have to let you go?**

**A. That is correct. He came into the office. I sat — he sat down and I said, I need to talk to you about my hours, and he said, We're going to have to let you go.**

c.   **Roger Coscarat's testimony, Doc. 66, page 39:**

Q. Do you remember -- **did you fire Matt Stevenson?**

A. **Yes.**

Additionally, Roger Coscarat signed and filled out Plaintiff's termination form.  <u>See</u>

Doc. 66, page 42.   A copy of the termination form was admitted into evidence and is attached

hereto as **Exhibit B**. It was signed by Mr. Coscarat as "Department Manager".  Moreover,

Mr. Coscarat  testified at trial as to the (alleged) reasons he took the action to terminated

Plaintiff.  He made much ado about Plaintiff supposedly watching too much TV: "And I found

Matt was watching TV and not paying attention to the game. And that was a big no-no for me

so..." (ellipses are in the trial transcript).  See Doc. 66, page 46-47).  Finally, Mr. Coscarat plainly admitted that he was the person that terminated Plaintiff.  Id. at page 39.

On the other hand, Brian Matthews was not  the meeting terminating Plaintiff, never informed Plaintiff that he was terminated, and did not sign Plaintiff's termination form.[2] When asked about the reasons Plaintiff was terminated by Mr. Cosocrat, Mr. Matthews stated "He did say something about that -- that he wasn't punching in his time cards." See Doc. 66, Page 88.  Notably, not punching his time cards is not a reason Defendant cited for Plaintiff's termination it its Motion for New trial.

### 4. Even if the timing of Plaintiff's termination standing alone is insufficient, Plaintiff's departure from its termination procedures proves causation.

Plaintiff also proved causation because Defendant departed from its normal practices when terminating Plaintiff.  In Sneed v. Montgomery Housing Authority, 956 F.Supp. 982, 987 (M.D. Ala.1997), aff'd, 136 F.3d 1331 (11th Cir.1998), a case in which a non-jury trial was held on two separate days, the court stated that "[t]he causal connection can be established by the timing of the adverse employment decision, by evidence that the defendant departed from its normal practices, or by evidence that the defendant took steps to conceal the reason for its adverse employment action."

Here, Plaintiff's Employee Handbook at page 10 provided that "Discharge for poor performance ordinarily will be preceded by an oral warning and a written warning."  Plaintiff was indisputably not provided with a written warning before he was terminated — nor was he even alleged to have performed they type of offense that would warrant immediate

---

2  Even if Brian Matthews was one of the decision-makers, a conclusion not supported by the evidence, there is substantial evidence for the Jury to reasonably conclude that he merely rubber-stamped the actions taken by Roger Coscarat.  Additionally, Mr. Coscarat's position as Poker Room Manager was sufficiently high to make him the Defendant's cat's paw and/or to make Defendant vicariously liable for his acts.

termination.  <u>See</u> the testimony of Roger Coscarat, Doc. 66, page 45.

### 5.   Defendant's reason for terminating Plaintiff was both unclear and concealed.

Defendant's refusal to provide Plaintiff with a reason for his termination also supports

a finding of causation.  No real reason was provided on Plaintiff's termination form, and when

he inquired about the reason it was concealed.  Both during the trial and in Defendant's own

Motion for New Trial, Defendant's reason  for terminating Plaintiff is nebulous at best.  A

causal connection also can be established by evidence that the defendant took steps to conceal

the reason for its adverse employment action.  <u>See Jordan v. Wilson</u>, 649 F.Supp. 1038, 1061

(M.D.Ala.1986).  <u>See also Mock v. Bell Helicopter Textron, Inc.</u>, 196 Fed.Appx. 773, 2006 WL

2422835 (C.A.11 (Fla.) 2006), discussed <u>infra</u>, Section II.B.

## II.   DEFENDANT IS NOT ENTITLED TO A NEW TRIAL

"'[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the

verdict is against the great – not merely the greater – weight of the evidence.'" <u>Tucker v. Hous.</u>

<u>Auth. of Birmingham Dist.</u>, 229 F. App'x 820, 826 (11th Cir. 2007).  Because some of

Defendant's arguments are the same as in its Motion for Directed Verdict, Plaintiff

reincorporates the arguments made above in regard to these issues.

### A.   Defendant's attack on Plaintiff's credibility is improper and unwarranted.

"Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge." <u>Reeves v.</u>

<u>Sanderson</u>, 530 U.S. 133, at 150 (2000); "[A]lthough the court should review the record as a

whole, it must disregard all evidence favorable to the moving party that the jury is not

required to believe." <u>Id.</u> at 151. Here, the Jury came back with its verdict in about an hour.

Thus, there was clearly no question in the Jury's eyes that Plaintiff was truthful.

Even if post-trial credibility determinations are proper, ironically it was Defendant's President that admitted to signing a perjurious statement in open court. Brian Matthews testified (as noted Doc. 65, at pages 17-19) that an important statement in his affidavit is not true. <u>See</u> **Exhibit C**, attached hereto (an excerpt of the trial transcript). This affidavit was submitted by Defendant in opposition to Plaintiff's Summary Judgment Motion. Mr. Matthew's testimony in this regard reads as follows, at Doc. 65, Page 18:

> **THE WITNESS:** "Also in February 2011 plaintiff was given a final warning that, if he did not use the time-clock, he would not be paid."
>
> **BY MR. MASSEY:**
> Q. Is that statement true?
>
> A. No, it's not.
>
> Q. But you signed this document under penalties of perjury, didn't   you?
>
> A. I signed it, yes.

Therefore, Defendants totally unsupported conclusion that Plaintiff's testimony was untruthful at trial is ironic – at best – given that Defendant's president submitted a partially false affidavit to the Court to oppose Plaintiff's Summary Judgment Motion.

**B.     Legitimate Business Reason and Pretext**

A Defendant has to articulate a legitimate, non-discriminatory "business" reason for termination. <u>See</u> <u>Demers v. Adams Homes of Northwest Florida, Inc. & Matthew Malone, Individually</u>, 2009 U.S. App. LEXIS 5844 *13 (11th Cir. March 20, 2009). Where the reasons that the employer offers for its adverse employment action are based on purely subjective factors, then the defendant's burden of articulation is greater. <u>See</u> <u>Chapman v. AI Transport</u>, 229 F.3d 1012, n. 22 (11th Cir. 2000). Subjective reasons, by their very nature, often serve to mask discrimination. <u>Id.</u> at 1044. In judging whether a subjective reason is legitimate, it must be "capable of objective evaluation." <u>Conner v. Fort Gordon Bus Co.</u>, 761 F.2d 1495,

1500 (11th Cir. 1985).

At trial, Defendant failed to sufficiently set forth a clear reason why Plaintiff was terminated.  This is reflected in Defendant's Motion for New Trial, wherein Defendant claims that "Plaintiff's co-workers testified he was a troublesome employee".  However, Roger Croscrat testified that Plaintiff was terminated for other reasons (such as watching TV) — all of which Plaintiff rebutted as untrue (See Doc. 66, Pages 105 - 108).  Moreover, at trial Defendant tried to convince the Jury that Plaintiff's failure to use the time-clock was reason for termination. See Doc. 66, Page 46-47.  Plaintiff's termination form told a different story as the "disciplinary" box was not checked and the only reason provided was "does not work out." See **Exhibit B**, attached hereto.

An employer's changed and/or new reasons for terminating an employee can support a finding of pretext.  See e.g. Wilson v. Phoenix Specialty Mfg. Co., Inc., 513 F.3d 378, 387-88 (4th Cir. 2008) (affirming the finding that all of defendant's explanations were pretextual, based in large part on fact that defendant offered explanation at trial that it had not previously offered to EEOC); Fitzgerald v. Action, Inc., 521 F.3d 867, 872-74 (8th Cir. 2008) (reversing grant of summary judgment to employer on ERISA claim partly because defendant changed its story as to why it fired plaintiff); Reeves v. Sanderson Plumbing, Inc., 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

Moreover, Defendant's reason (even if it had clearly articulated one) for terminating Plaintiff could reasonably be disbelieved by the Jury.  See  St. Mary Honor Center v. Hicks, 509 U.S. 502, 511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.").  As

19

previously mentioned, Brain Matthews (Defendant's President) essentially admitted to perjury on the stand during trial.  Also, Defendant did not provide Plaintiff with a written warning prior to his termination as previously discussed.  The timing of Plaintiff's termination, the "reason" set forth in Plaintiff's termination form (or lack thereof), and inability for Defendant to clearly articulate its reasons for terminating Plaintiff also lend substantial support to a finding of pretext.

Finally, because Defendant refused to provide Plaintiff with a reason for his termination, that alone can satisfy a showing of pretext. Plaintiff's testimony as to what occurred during his termination is as follows (Doc. 66, Page 13):

> And I'm like, Did I do something wrong? He goes, No. I go, Am I a bad employee? He said, No. I said, I don't understand. Why am I being fired? And he's, like, It's just not going to work out. **And I'm, like, Can you explain that? And he goes, It's just not working out.**

(e.s.).  In <u>Mock v. Bell Helicopter Textron, Inc.</u>, 196 Fed.Appx. 773, 2006 WL 2422835 (11th Cir. 2006), an unpublished decision, the Court held that if a Defendant eventually comes up with reasons different that those sited during termination then it can be used to show pretext. The Court held as follows:

> There is a dispute as to when Bell informed Mock of the reason for his termination. At the time Bell informed him that he was being fired, he insisted that it give him the reason for its decision. Bell refused to do that. It was not until later, in a letter, that it told him that he had been terminated for unacceptable performance. **In light of Bell's refusal to tell Mock-at the time it fired him-why his employment had come to an end,** a trier of fact reasonably could find that the letter constituted a pretext for discrimination.

(e.s.).  Similarly, the Jury could reasonably have determined that the Defendant's hodgepodge of poorly articulated and general reasons for terminating Plaintiff (none of which were expressed at his termination) were pretext for discrimination.

Dated: March 29, 2013                    /s/Michael Massey, FBN 153680

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has filed and served

on the below counsel on March 29, 2013 via filing with the Court's ECF system which will

send a copy to the following:

Tracy Martinell Henry, Esq.
Florida Bar No.:  073865
13577 Feather Sound Drive, Suite 670
Clearwater, FL 33762
Telephone:  (727) 329-1999
Facsimile:  (727) 329-1499

                                   MASSEY & DUFFY, LLC

                                   /s/Michael Massey
                                   Michael Massey
                                   Fla. Bar No. 153680
                                   Massey & Duffy, PLLC
                                   855 E. Univ. Ave.
                                   Gainesville, FL 32601
                                   352-505-8900